UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

OCCUPY BUFFALO, through its member-
base, including but not limited to LISA
RICHARDSON, HERON SIMMONDS-PRICE,
JOHN ROSZMAN, DANA GERACE, *et al.*,

        Plaintiffs,

   v.

CITY OF BUFFALO, BYRON BROWN, in his
official capacity as Mayor of the City of Buffalo,
DANIEL DERENDA, in his official capacity as
the Police Chief, MICHAEL DeGEORGE, in his
official capacity as director of communications,
and other presently unidentified officials,
employees and/or agents of the City of Buffalo
in their official and individual capacities, JOHN
DOE and RICHARD ROE, *et al.*, and other
presently unidentified local, state, or federal
officials or agents,

        Defendants.

**DECISION AND ORDER**

13-CV-407S

## I.  INTRODUCTION

In the fall of 2011, Plaintiff Occupy Buffalo ("Occupy") established an encampment in Niagara Square as part of an international movement protesting growing income inequality, which the City of Buffalo initially permitted pursuant to an agreement. But when the agreement ended, Buffalo police and public works employees cleared both the protesters and their belongings from Niagara Square, over their objections. Occupy and its members allege that their removal from the Square violated their rights under the United States and New York Constitutions and under New York law. Defendants have moved for summary judgment on these claims. (Docket Nos. 62, 74.) Because Plaintiffs

1

have failed to come forth with sufficient evidence to support their causes of action, Defendants' motion for summary judgment is granted.

## II.  BACKGROUND

Unless otherwise noted, the following facts are undisputed for purposes of the motion for summary judgment. This Court takes the facts in the light most favorable to Occupy, the non-moving party.  See Mitchell v. City of New York, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").

Occupy Buffalo is a "non-hierarchical organization comprised of individuals interested in creating a more economically and politically just City of Buffalo and United States." (Complaint, Docket No. 1, ¶ 7.) In early October 2011, several members of Occupy Buffalo "established a round-the-clock encampment in Niagara Square," in solidarity with other Occupy groups around the country. (Id., ¶ 15.) Occupy erected tents where members could interact with each other and with the public and could sort and redistribute donations from Buffalonians supportive of Occupy's goals. (Id.) The tents stored members' personal belongings and items donated to the group. (Id.) Around 50 members of Occupy Buffalo "took up permanent residence at the encampment." (Id., ¶ 18.)

Niagara Square is a park subject to Chapter 309 of the City of Buffalo Charter and Code. (Defendants' Statement of Undisputed Facts, Docket No. 62-21, ¶ 1.) Chapter 309-15 states, in part, that "no person shall sleep in any park or park approach." (Docket No. 62-3 at p. 1.) Chapter 309 also limits the depositing of any kind of garbage on the grounds

of any park without a permit from the Commissioner of Public Works (§ 309-14, Docket No. 62-4), and provides that parks shall be closed between sunrise and sunset (§ 309-25A, Docket No. 62-5.) Erecting tents or temporary structures in city parks is forbidden without the permission of the Common Council, which may impose "reasonable conditions" on the same. (§ 309-36, Docket No. 62-7.) No tent erected for a special event may "remain erect for longer than 15 days unless extended by the Common Council." (Id.)

On or around December 9, 2011, two months after Occupy established its encampment, the City entered an agreement with Occupy allowing its members to use and sleep in Niagara Square, subject to certain terms and conditions ("the Agreement"). (Defendants' Statement of Undisputed Facts, Docket No. 62-21, ¶¶ 3-4; see also Agreement, Docket No. 62-13 at pp. 1-7.) The City agreed to allow Occupy to camp in tents overnight and to place posters, signs, and banners in the Square. (Docket No. 62-13 at pp.1-2.) Occupy agreed to follow proper sanitary procedures, to facilitate Square maintenance by the City, and to collect financial donations for the seeding, maintenance, and electricity costs to the City. (Id. at p. 3.) Occupy also agreed to move from Niagara Square to Lafayette Square (just two blocks away) if required due to inclement weather, to accommodate the City's snow removal operations, or if another community event sought to use Niagara Square. (Id. at pp. 2-3.) The Agreement extended through February 1, 2012, and was "renewable for additional periods of two months upon compliance with the terms contained herein and continued safe operation within the Square." (Id. at p. 3.) Occupy understood the Agreement to mean that extensions would be "rubber-stamped" as long as Occupy complied with its terms. (Docket No. 74 at p. 16.)

3

In January 2012, the City began efforts to renegotiate the Agreement. (Docket No. 62-21, ¶ 6.) The City asserts that it did so because it needed to prepare for the upcoming festival season, and because remediation of the Square would have become more difficult if Occupy continued to inhabit it. (Id., ¶¶ 6-7.) The City also suggests that it sought renegotiation to reopen the Square for use by all citizens, and to address complaints received by the Mayor's Call and Resolution Center. (See Declaration of Timothy Ball, Docket No. 62-11, ¶ 5; Affidavit of Robert Kratenstein, Docket No. 62-15; "Case Details" of calls, Docket No. 62-16.) In a letter dated February 1, 2012, the City offered Occupy the chance to stay in Niagara Square through March 1, 2012, if Occupy accepted new terms and conditions. (Docket No. 62-14 at p. 1.)

Occupy states that renegotiation discussions began only five days before the February 1 expiration of the Agreement, and that, because of its consensus-based decisionmaking process, there was not enough time for it to agree on a new agreement. (Plaintiffs' Statement of Undisputed Facts, Docket No. 74 at p. 16.)  According to Occupy, at a final meeting on the evening of February 1, 2012, the City presented a new agreement that Occupy was unable to agree upon by the midnight deadline. (Id. at pp. 16-17.)

Consequently, early in the morning of February 2, 2012, the City directed Occupy members to leave the Square. (Docket No. 62-21, ¶ 10; see also Docket No. 1, ¶ 19.) Occupy asserts that a SWAT unit and a militarized tank were present during the initial confrontation between Buffalo police and Occupy members. (Docket No. 1, ¶ 27.) The City also asked Occupy members to remove their belongings from the Square. (Id.)  The parties contest the manner in which this occurred: the City asserts that it gave Occupy

members the opportunity to gather their belongings, and that it eventually used a truck to remove property that appeared to be abandoned. (Docket No. 75-1, ¶ 15.) Occupy asserts that its members asked for time to retrieve their possessions, but that they were "forced to leave the Square without being given the opportunity to gather any personal property." (Docket No. 74, ¶ 15.)

The City asserts that after giving Occupy members time to remove their property, it removed "abandoned" property from the Square and took it to an enclosed and heat-regulated property, where it was sorted and made ready for Occupy members to claim during business hours. (Docket No. 62-21, ¶¶ 16-20.) Occupy alleges in its complaint that its members attempted to retrieve their belongings, but that "with the exception of a few sleeping bags, all of the items…were completely destroyed and heaped into a single pile of unnavigable debris." (Docket No. 1, ¶ 35.)

### III.  DISCUSSION

Occupy brought this action against the City on April 23, 2013. (Docket No. 1.) Occupy raises twelve claims in its complaint.  First, it claims that the City's removal of members' property from Niagara Square was an unreasonable seizure in violation of members' Fourth Amendment rights. Second, it claims that Defendants violated members' due process rights under the Fourteenth Amendment when they seized members' possessions in Niagara Square. Third, it claims that Defendants violated members' First Amendment rights by destroying their forum for expression. Fourth, Occupy claims that the show of force with which Defendants removed members from the Square violated members' Eighth Amendment rights. Fifth, Occupy claims that

Defendants are liable to it for failing to supervise and train City employees, resulting in the violation of members' constitutional rights. Occupy also claims that Defendants violated their rights under the New York Constitution, specifically Article 1, section 8 (Sixth Cause of action); Article 1, section 12 (Seventh Cause of Action), and Article 1, section 6 (Eighth Cause of Action). Finally, Occupy brings claims under New York law against Defendants for conversion (Ninth Cause of Action), replevin (Tenth Cause of Action), negligence (Eleventh Cause of Action), and negligent supervision and training (Twelfth Cause of Action).

Occupy seeks a declaratory judgment that Defendants violated their federal and state constitutional rights, as well as damages in the amount of $15,000, and punitive damages against the John Doe individual defendants.

Defendants move for summary judgment on each of Occupy's claims.

## A.    Procedural Posture

This case has a long history. Occupy filed its complaint on April 23, 2013. Following Defendants' answer on July 2, 2013 (Docket No. 9), the parties requested and were granted multiple adjournments of their filing deadlines. (See Docket Nos. 24, 26, 27, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54, 56.) On September 21, 2017, the Honorable Hugh B. Scott, United States Magistrate Judge, directed the parties to complete all discovery by November 30, 2017, and set a final deadline for the filing of dispositive motions by February 28, 2018. (See Docket No. 61.) Neither party appears to have conducted any discovery.

On February 28, 2018, Defendants filed a so-titled Motion to Dismiss, which consisted of a collection of documents with a memorandum of law requesting both

6

dismissal and summary judgment. (Docket No. 62.) Upon instructions from the Clerk of Court, Defendants refiled their memorandum as a Motion for Summary Judgment on March 1, 2018, with no new documents attached. (See Docket No. 63.) The documents Defendants submitted with their initial memorandum include a Rule 56 statement of undisputed facts, the sworn affidavits of defendant Daniel Derenda and non-parties Donald Poleto, Andrew Rabb, and Richard Kratenstein, a copy of the Agreement, the City's February 1, 2012 letter to Occupy regarding renegotiating the Agreement, an inventory of items removed from the Square, and sections of § 309 of the Buffalo Code.

Occupy responded to Defendants' motion as a Motion for Summary Judgment, submitting with its memorandum of law a Rule 56 statement of facts, a copy of the Agreement, its 50-e notice of claim against the City, and a log of calls to the City's call resolution center, but no affidavits. (See Docket No. 74.)

Federal Rule of Civil Procedure 12 (d) states that when the Court considers documents outside the pleadings, a motion must be assessed under the standard for summary judgment. When this happens, "all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12 (d). Because Defendants re-titled their motion as a Motion for Summary Judgment, and because Occupy responded to it as such, this Court finds that Occupy had a reasonable opportunity to present pertinent material and will therefore assess Defendants' motion under the summary judgment standard.

**B.   Summary Judgment**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56 (a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading...."); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which the jury could reasonably find for the non-moving party. See Anderson, 477

8

U.S. at 252.

In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

**C.      Claims against unnamed defendants and official-capacity claims**

**1.   Claims against unnamed defendants**

In its complaint, Occupy names as defendants "other presently unidentified officials, employees and/or agents of the City of Buffalo in their official and individual capacities, JOHN DOE and RICHARD ROE, *et al.* and other presently unidentified Local, State or Federal officials or agents." (Docket No. 1.) There is no evidence in the record that any of these unnamed parties has been identified or served.

Federal Rule of Civil Procedure 4 (m) requires dismissal, absent a showing of "good cause," of claims against a defendant who is not served within 90 days of the filing of the complaint. "Courts typically resist dismissing suits against John Doe defendants until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials." Coward v. Town & Vill. of Harrison, 665 F.Supp.2d 281, 300 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). Where, as here, a plaintiff has had ample time to discover the identities of the unnamed officials and has not yet named them, or served them, dismissal without prejudice is proper. See, e.g., Webb v. Miller, No. 918CV610TJMDJS, 2020 WL 1227155, at *2 (N.D.N.Y. Mar. 12, 2020); Cruz v. City of New York, 232 F. Supp. 3d 438, 448–49 (S.D.N.Y. 2017); Delrosario v. City of

New York, No. 07 CIV. 2027 (RJS), 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (dismissing claims against unnamed defendants without prejudice where plaintiff had ample time and opportunity to discover their identities). As an initial matter, therefore, this Court will dismiss Occupy's claims against the unnamed officials, employees and agents of the City of Buffalo, John Doe, Richard Roe, and "other presently unidentified Local, State, or Federal officials and or agents."

### 2. Official-capacity claims

Occupy brings its claims against Byron Brown, Daniel Derenda, and Michael DeGeorge solely in their official capacities. Defendants argue that these claims should be dismissed because an official-capacity claim is redundant with a claim against a municipality. This Court agrees.

An official-capacity suit is, essentially, a suit against the municipality of which the officer is an agent. Stancati v. Cty. of Nassau, No. 14-CV-2694 JS ARL, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (citing Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985)). "[I]n the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." Phillips v. Cty. of Orange, 894 F.Supp.2d 345, 385 (S.D.N.Y. 2012). This Court will therefore dismiss the claims against Byron Brown, Daniel Derenda, and Michael DeGeorge as redundant.

### D. Federal Constitutional claims

Occupy brings its federal claims pursuant to 42 U.S.C. § 1983. Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.

See 42 U.S.C. § 1983.  On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in federal statutes and the Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)).  Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged.  See Baker, 443 U.S. at 140.  Here, Occupy's federal claims are grounded in the First, Fourth, Eighth, and Fourteenth Amendments.

In opposing Occupy's claims, the City argues that it cannot be held liable pursuant to § 1983 because Occupy has not established the existence of a municipal policy or custom. It further argues that Occupy has not met its burden to defeat summary judgment on any of its constitutional claims. This Court will consider these arguments in turn.

### 1. Municipal liability

To prevail on a claim against a municipality under § 1983, a party must establish, as a threshold matter, that a "municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).

For Occupy to succeed on its constitutional claims, therefore, it must show that an official policy of the City caused its alleged constitutional injuries. The City—the sole remaining defendant—argues that Occupy has only stated in conclusory fashion that the City acted pursuant to an official policy, and that Occupy "ha[s] not presented any plausible theory of municipal liability." (Docket No. 62-22 at p. 13.)

A municipality can be held liable for a single act "tailored to a particular situation

not intended to control decisions in later situations," as long as the act was directed by an official policymaker. Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 406, 117 S. Ct. 1382, 1389, 137 L. Ed. 2d 626 (1997); see also Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S. Ct. 1292, 1298–99, 89 L. Ed. 2d 452 (1986).

> This is because
>
> [i]f the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

Pembaur, 475 U.S. at 480–81.

The City's actions on February 2, 2012, therefore, can represent an official policy, as long as those actions were directed by "authorized decisionmakers." Id. Here, the City does not argue that the February 2, 2012 order to vacate the Square was ordered by someone other than an authorized decisionmaker. Indeed, evidence in the record suggests that authorized decisionmakers issued and implemented the order. For example, Police Commissioner Daniel Derenda states that following the expiration of the Agreement between Occupy and the City, "the Buffalo Police Department immediately enforced the City's laws and ordinances in asking individuals to vacate the square." (Docket No. 62-17, ¶ 8.)  Senior Engineer Donald Poleto states that "a truck used by the Department of Public Works" removed materials from Niagara Square, and took them to a City facility at 1120 Seneca Street, where Public Works employees sorted them. (Docket No. 62-19, ¶¶ 6, 8.) A police officer was assigned to assist with claims to the property. (Id., ¶ 13.)  All of these facts point to official action by the City, and Defendants

12

nowhere argue to the contrary.

Consequently, this Court finds sufficient evidence from which it could reasonably be concluded that police and public works employees acted pursuant to an official policy in removing protesters and their possessions from Niagara Square. The analysis now proceeds to whether any of Occupy's federal constitutional claims against the City can survive summary judgment.

### 2. Occupy's Fourth Amendment property-seizure claim (first cause of action)

Occupy argues that the City's removal of its members' possessions from the Square violated their Fourth Amendment rights. Occupy suggests that its members' ownership of items seized should have been obvious to the City. The City argues that Occupy has not identified a possessory interest of any member in any particular item removed from Niagara Square, and that summary judgment is therefore warranted on Occupy's Fourth Amendment claim.

#### a. Legal standard

The Fourth Amendment provides, in pertinent part, that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. Discussing the Fourth Amendment, the Supreme Court has stated that "a 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed," while "a 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85 (1984).

To succeed when claiming an unconstitutional seizure, then, a party must first

assert a possessory interest in an item seized.[1] This is seen in the criminal context in the doctrine of standing, by which a defendant moving for suppression of evidence must assert, via affidavit, that he or she had a "property or possessory interest in the place searched or the items seized." United States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997).

Civil litigants can also assert Fourth Amendment seizure claims. Soldal v. Cook Cty., Ill., 506 U.S. 56, 69, 113 S. Ct. 538, 548, 121 L. Ed. 2d 450 (1992) ("[T]he right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all. … [I]t would be 'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'") (citing Camara v. Mun. Court of City & Cty. of San Francisco, 387 U.S. 523, 530, 87 S. Ct. 1727, 1732, 18 L. Ed. 2d 930 (1967)). But it follows that civil claimants, too, must establish a possessory interest at stake when challenging the government's seizure of their property.

If it is established that a property interest is at stake, a court must then assess whether the seizure was reasonable under the Fourth Amendment. This inquiry requires a "careful balancing of governmental and private interests." Soldal, 506 U.S. at 71.

### b. Occupy cannot defeat the City's motion on its Fourth Amendment claim

Here, the City argues that Occupy has failed to identify property interests in any items seized and destroyed, and therefore lacks standing to pursue a Fourth Amendment

---

[1] Parties can alternatively assert the violation of a privacy interest. See Katz v. United States, 389 U.S. 347, 88 S.  Ct. 507, 19 L. Ed. 2d 576 (1967), and its progeny. But the invasion of possessory interests, even without the assertion of any privacy interest, can still violate the Fourth Amendment. See Soldal v. Cook Cty., Ill., 506 U.S. 56, 64, 113 S. Ct. 538, 544, 121 L. Ed. 2d 450 (1992).

seizure claim. (Docket No. 62-22.) In support of its motion, the City submits the declaration of Donald Poleto, stating, "I observed that those materials [in Niagara Square] were left largely exposed to the elements in what appeared to be standard recreational camping tents" (Docket No. 62-19, ¶ 4), and the declaration of Daniel Derenda, stating that after the police asked individuals to leave the Square and remove their belongings, the City "remov[ed] *what appeared to be abandoned property* from the Square." (Docket No. 62-17, ¶ 8.) (emphasis added.)

To defeat the City's motion for summary judgment, Occupy must provide admissible evidence of its possessory interest in the items it claims were seized. Occupy has not done so. Instead, Occupy relies on the general descriptions in its complaint of "food, books, tables, chairs, tents, clothing, art supplies, basic medical supplies, and a plethora of other items supplied by Buffalonians supportive of the Occupy movement's goals and activities" (Docket No. 1, ¶ 15), and on conclusory statements that Defendants "deprived them of their property unlawfully." (Docket No. 74 at p. 6). At summary judgment, however, a nonmoving party must "offer some hard evidence showing that its version of the events is not wholly fanciful," Matsushita, 475 U.S. at 586, and cannot "merely rest on the allegations …of [its] pleading." Wright, 554 F.3d at 266. Because Occupy has submitted no admissible evidence from which a jury could reasonably conclude that Occupy or any of its members had a protected interest in any particular item removed from the Square, the City is entitled to summary judgment on Occupy's Fourth Amendment claims.

### 3. Occupy's Fourteenth Amendment due process claim (second cause of action)

Occupy argues that the City violated its members' Fourteenth Amendment due

15

process rights by not giving them time to retrieve their possessions in the Square, and by not offering a sufficient procedure by which they could later reclaim them. The City argues that Occupy has not identified a protected property interest in any item taken. It further argues that the process offered to Occupy was sufficient, in that City employees gave members time to collect their possessions, told them how to retrieve the items, and held the items for subsequent pickup.

### a.  Legal standard

The Fourteenth Amendment to the United States Constitution guarantees that no person shall be deprived "of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. "The touchstone of due process, of course, is 'the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" Spinelli v. City of New York, 579 F.3d 160, 169 (2d Cir. 2009) (quoting Mathews v. Eldridge, 424 U.S. 319, 348–49, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). "It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" Fuentes v. Shevin, 407 U.S. 67, 80, 92 S. Ct. 1983, 32 L.Ed.2d 556 (1972) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)). These requirements are not uniform, however, as "due process is flexible and calls for such procedural protections as the particular situation demands." Eldridge, 424 U.S. at 334.

To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, courts (1) "identify the property interest involved," and (2) "determine whether the plaintiff received constitutionally adequate process in the course of the deprivation." O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir.

2005) (citing <u>Harhay v. Town of Ellington Bd. of Educ.</u>, 323 F.3d 206, 212 (2d Cir. 2003)).

Once it is determined that there is a property interest involved, courts analyze claims under the three-factor balancing test prescribed in <u>Eldridge</u>, weighing: "'(1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; [and] (3) the government's interest, including the possible burdens of alternative procedures.'" <u>Kuck v. Danaher</u>, 600 F.3d 159, 163 (2d Cir. 2010) (quoting <u>O'Connor</u>, 426 F.3d at 197).

### b. Occupy cannot defeat the City's motion on its Fourteenth Amendment claim

Occupy argues that the City did not give its members sufficient time to retrieve their possessions, that it destroyed their tents, and that it placed their items "in a single pile of unnavigable debris." (Docket No. 74 at p. 17, Docket No. 1, ¶ 35.) The City argues that Occupy members have not asserted a property interest in any items removed from the Square. The City also argues that Occupy members were given an appropriate amount of time to retrieve their possessions on February 2, 2012, and ample opportunity to retrieve their possessions after that date.

First, the City argues that Occupy and its members have submitted no evidence identifying the items taken and have not asserted a property interest in any item. (Docket No. 62-22 at p. 9.) They further this argument with Daniel Derenda's statement that the items removed "appeared to be abandoned." (Docket No. 62-17, ¶ 8.) To defeat Defendants' motion, Occupy must present admissible evidence showing a genuine issue of fact regarding their interest in the items removed. Such evidence could take the form of a sworn affidavit attesting to a member's possessory interest in any given item that was removed. But Occupy has not submitted any evidence, instead relying on conclusory

17

statements that cannot, for the reasons stated above, defeat a motion for summary judgment. This Court therefore finds no evidence in the record from which a jury could find a protectible property interest.

But even if Occupy could properly establish a property interest, there is insufficient evidence from which a jury could find that the process afforded to Occupy members was inadequate. Derenda's sworn affidavit states that the Police asked individuals to remove their belongings, and only then removed *what appeared to be abandoned property* from the Square. (Derenda affidavit, Docket No. 62-17, ¶ 8.) Defendants further assert that "all individuals were given the opportunity to gather their belongings." (Docket No. 75-1, ¶ 15.) The affidavit of Donald Poleto asserts that the materials collected from Niagara Square were kept in a heat-regulated garage facility and sorted by approximately five workers over the course of two or three days, so that they could be made available to claim. (Id.) "Nothing was thrown out." (Id.) Defendants have submitted police "property reports" detailing the items removed from the Square. (Docket No. 62-20.)

In countering Defendants' motion, Occupy must support its claims that it was not given time to retrieve its items, and that the items were subsequently destroyed, with some form of admissible evidence. Occupy has not done so, nor has it suggested any alternative procedures that would have provided the process its members were due. In the absence of any admissible evidence countering the City's assertions, no reasonable jury could find in Occupy's favor. This Court will therefore grant the City's motion for summary judgment on Occupy's Fourteenth Amendment claim.

### 4. Occupy's First Amendment claim (third cause of action)

Occupy argues that the City's sudden revocation of its permission to use the

Square violated its members' First Amendment rights by abruptly terminating their expressive conduct. The City argues that there was no violation of Occupy's First Amendment rights. It argues that it lawfully removed Occupy members from Niagara Square around 2:00 a.m. pursuant to a valid time, place, and manner restriction on Occupy members' speech, after Occupy's temporary permission to use the Square had ended.

### a. Legal standard

The First Amendment protects, among other things, "free and unhindered debate on matters of public importance." Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois, 391 U.S. 563, 573, 88 S. Ct. 1731, 1737, 20 L. Ed. 2d 811 (1968). But "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Mitchell v. City of New Haven, 854 F. Supp. 2d 238, 253 (D. Conn. 2012) (quoting Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981)).

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 44, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). According to this "forum-based" approach for assessing restrictions on the use of government property, courts must determine the nature of the space in question. Mitchell v. City of New Haven, 854 F. Supp. 2d 238, 247 (D. Conn. 2012). "Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." Id. at 802. Streets and parks have long been identified as paradigmatic public fora. Perry, 460 U.S. at 45 ("Streets and parks …

19

'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S. Ct. 954, 963, 83 L. Ed. 1423 (1939)). As a public park, Niagara Square qualifies as such a traditional public forum.

The Supreme Court has held that, in traditional public fora,

[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 3068–69, 82 L. Ed. 2d 221 (1984).

In Clark, a case with facts somewhat similar to those now before this Court, the National Park Service denied a permit to protesters who wished to camp in tent cities in Lafayette Park and on the national Mall to demonstrate the plight of the homeless. Id. at 291-92. The Court assumed without deciding that the erection of tents and camping were protected "expressive conduct." Id. at 292. The Court then held that the restriction banning camping was reasonable, because it was content-neutral and narrowly tailored to protecting the government's interest in keeping the park "in an attractive and intact condition for all users," and because alternative channels of expression remained for the protesters. Clark, 468 U.S. at 295 ("The regulation otherwise left the demonstration intact, with its symbolic city, signs, and the presence of those who were willing to take their turns in a day-and-night vigil. Respondents do not suggest that there was, or is, any barrier to delivering to the media, or to the public by other means, the intended message concerning

20

the plight of the homeless.")

To defeat Defendants' motion, therefore, Occupy must provide some evidence that the City's regulations are not content-neutral, are not narrowly tailored to a significant government interest, or that there were no alternative channels available for its symbolic conduct.

### b. Occupy cannot defeat the City's motion on its First Amendment claim

Occupy has not brought forth any such evidence. Occupy argues that it "occupied" the Square pursuant to a "renewable agreement" with the City, and that the City terminated the Agreement and enforced the pre-existing laws governing the Square in bad faith and contrary to Occupy's belief that it would be given more time to negotiate. Occupy does not argue, however, that the regulations the City enforced were unconstitutional.

Addressing the issue of Occupy's permission to use the Square first, Occupy appears to argue that the City's refusal to honor the Agreement, after the parties failed to renew it, did not comport with its reasonable expectation to be afforded more time to renegotiate. Occupy also argues that the City unlawfully "evicted" it from the Square without the notices required by New York law. (Docket No. 73 at p. 3.) The parties agree, however, that the Agreement expired by its terms at midnight on February 1, 2012, and that the City then acted pursuant to its existing regulations. The real issue, therefore, appears to be whether these regulations are valid. Thus, this Court will not address Occupy's contract construction or illegal eviction arguments because they do not elucidate the constitutional issues on which Occupy bases its claim.

Occupy's First Amendment claim is that the regulations governing Niagara Square,

pursuant to which the City removed it from the Square, were invalid restrictions on their expressive activity. In countering this claim, the City argues that it was enforcing a valid time, place, and manner restriction. It provides the text of all the relevant laws, which on their face are content-neutral. (See Docket Nos. 62-3, 62-4, 62-5, 62-6, 62-7.) It also submits evidence that its decision to enforce its regulations upon expiration of the Agreement was not content-based, but rather, was motivated by the desire to re-open meaningful access to Niagara Square so that it could be used and enjoyed by all citizens. (Declaration of Timothy Ball, Docket No. 62-11, ¶ 5.)  And there is no claim that the City prevented Occupy members from protesting in the Square after the cleanup, or from protesting in a different public location.

To defeat the City's motion, Occupy is required to present admissible evidence raising a genuine issue of fact. Occupy has failed to do so. In its complaint, Occupy asserts that the City's action "destroyed [its] forum for learning and the exchange of ideas," and that the City's "excessive response to a long-standing and peaceful protest" had a "chilling effect on the First Amendment rights of both the individuals present at the square that evening, and of citizens who might have otherwise joined the ranks of Occupy Buffalo." (Docket No. 1, ¶¶ 51-52.) But in responding to Defendants' motion, Occupy does not provide admissible evidence suggesting that the City's regulations do not pass constitutional muster. It does not point to any facts suggesting that these regulations are not content-neutral; that the City's interests in deciding to enforce its laws were not significant; or that Occupy lacked alternative channels for its expressive conduct.

At summary judgment, a nonmoving party must "offer some hard evidence showing that its version of the events is not wholly fanciful," Matsushita, 475 U.S. at 586,

and cannot "merely rest on the allegations …of [its] pleading." <u>Wright</u>, 554 F.3d at 266. Occupy has not met this burden, and this Court will accordingly grant Defendant's motion on Occupy's First Amendment claim.

### 5. Occupy's Eighth Amendment excessive-force claim (fourth cause of action)

In its complaint, Occupy states that Defendants used an excessive showing of force in clearing Niagara Square, in violation of its members' Eighth Amendment rights. The City provides evidence stating that "the tactical staffing provided by the Police Department …  was largely precautionary, made for both officer and public safety, and appropriate for the circumstances and scale of the assignment we were undertaking." (Affidavit of Daniel Derenda, Docket No. 62-17, ¶ 9). Derenda further states that arrests that took place were in response to disorderly conduct, and that he was "unaware of any claims of excessive physical force … or physical injuries." (<u>Id.</u>, ¶ 10.) Occupy does not address its Eighth Amendment claims in its response to Defendants' motion. (Docket No. 74.)

### a. Legal standard

The Eighth Amendment protects those convicted of a criminal offense from cruel and unusual punishments. <u>Ingraham v. Wright</u>, 430 U.S. 651, 664, 97 S. Ct. 1401, 1408–09, 51 L. Ed. 2d 711 (1977). On the other hand, "[c]laims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." <u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989). Because the conduct Occupy alleges took place in the context of the arrests of some members in Niagara Square, this Court finds that Occupy's

23

excessive force claims arise under the Fourth Amendment.

To trigger the Fourth Amendment's protections against the use of excessive force, an arrest, or "seizure," of the person is needed. See California v. Hodari D., 499 U.S. 621, 626, 111 S. Ct. 1547, 1550, 113 L. Ed. 2d 690 (1991). Courts within the Second Circuit "have been reluctant to entertain excessive-force claims without any physical contact. Mere threats or verbal harassment, without any 'appreciable injury,' generally are not actionable under section 1983." Merrill v. Schell, 279 F. Supp. 3d 438, 443–44 (W.D.N.Y. 2017) (citing Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam) (citations omitted)). To establish that the use of force during arrest was unreasonable and therefore a violation of the Fourth Amendment, a plaintiff must establish that the government interests at stake were outweighed by "the nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests." Graham v. Connor, 490 U.S. at 396.

### b. Occupy cannot defeat the City's motion on its excessive-force claim

Occupy does not make any of the above arguments in its response to the City's motion. It does not describe, or offer any evidence of, any force used during the arrest of any particular member. Nor does Occupy state that any actual force was used, but rather a "showing of force."  Occupy does not even mention its showing-of-force claims in its response memorandum. (See Docket No. 74.) Occupy's complaint states that "a large SWAT unit and a militarized tank" were used "solely to intimidate Occupy members" and that this "unnecessary and terrifying show of force was likely to retraumatize individuals who had previously experienced significant trauma at the hands of law enforcement." (Docket No. 1, ¶¶ 27, 56.) These conclusory allegations, without any admissible evidence to support them, cannot withstand a motion for summary judgment. Accordingly, this

24

Court finds that Occupy has not presented any evidence from which a jury could find that any member's Fourth Amendment right to be free from excessive force was violated.

This Court will also grant summary judgment due to Occupy's abandonment of this claim. When a represented party responds to only some of a moving party's claims in its response to a motion for summary judgment, courts may deem the unopposed claims abandoned. Jackson v. Fed. Exp., 766 F.3d 189, 195 n. 3 (2d Cir. 2014). In other words, a court "is not required to consider what the parties fail to point out." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000). This Court finds Occupy's excessive force claim abandoned, and grants summary judgment on this basis as well.

### 6. Constitutional failure-to-train and failure-to-supervise claims (fifth cause of action)

Occupy's fifth cause of action states that Defendants "failed to train and supervise their officials, employees and agents…so as to prevent the seizures and destruction of Plaintiffs' property," resulting in the violation of Occupy's constitutional rights. (Docket No. 1, ¶ 59.) The City argues that it cannot be liable for a failure to train or supervise because Occupy does not make particularized allegations that the action of any City employee caused any injury to Occupy. (Docket No. 62-22 at p. 9.) Occupy does not address these arguments in its response, or provide any evidence regarding the City's training programs, individual actions by City employees, or the supervision on Niagara Square on the morning of February 2, 2012.

### a. Legal standard

A municipality is liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129–

25

30 (2d Cir. 2004). To succeed, a plaintiff must provide evidence both of the municipality's deliberate indifference to a risk and of a specific deficiency in a training program. Id. A plaintiff must also establish that the deficiency in training is "closely related to the ultimate injury," such that it "actually caused" a constitutional deprivation. Id.

A municipality is liable for failure to supervise an employee when a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was "obvious," and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction. Id. at 128.

### b. Occupy cannot defeat the City's motion on its failure-to-train or failure-to-supervise claims

As an initial matter, as discussed above, Occupy has not provided facts from which a jury could find that any constitutional violations took place. Its failure-to-train and failure-to-supervise claims fail on that basis alone. Further, it has not offered any evidence in support of these claims, such as evidence of the City's training programs or of an official's awareness of and failure to rectify unconstitutional conduct.

As a further basis for granting Defendants' motion, Occupy does not address or support these claims in its response papers. This Court therefore deems Occupy's failure-to-train and failure-to-supervise claims abandoned. For all these reasons, this Court will grant the City's motion on Occupy's failure-to train and failure-to-supervise claims.

### E.  This Court declines to exercise supplemental jurisdiction over Occupy's claims arising under New York law.

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of

the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Subsection (c) of § 1367 "confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997). A district court "may decline to exercise supplemental jurisdiction" if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C § 1367(c)(3). Here, since this Court is granting Defendants' motion for summary judgment on each of Occupy's federal claims, there is no independent basis for federal jurisdiction over Occupy's state law claims. See, e.g., United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Having granted summary judgment on Occupy's First, Fourth, Eighth, and Fourteenth Amendment claims, this Court declines to exercise supplemental jurisdiction over Occupy's claims based on the same events arising under the New York Constitution and New York law. Accordingly, these claims will be dismissed.

## IV.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted. Because Occupy has neither identified nor served any of the unnamed defendants, this Court will dismiss its claims against all unnamed defendants. This Court will also dismiss as redundant Occupy's claims against any named defendants in their official capacities. This Court further finds that Occupy has not raised any issues of fact pertaining to its First, Fourth, Eighth, and Fourteenth Amendment, and failure-to-train or

supervise, claims against the City of Buffalo. This Court will accordingly grant Defendants' motion for summary judgment on these claims. (First, Second, Third, Fourth, and Fifth Causes of Action.)

Having granted summary judgment on Occupy's federal claims, this Court declines to exercise supplemental jurisdiction over Occupy's state law claims arising from the same facts. Accordingly, all of Occupy's state law claims will be dismissed. (Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Causes of Action.)

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 62) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

Dated:      May 12, 2020
             Buffalo, New York

                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge